UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| BRIAN STANISLAUS, Individually and **:**<br>On Behalf of All Others Similarly **:**<br>Situated, **:**<br>     **Plaintiff** **:**<br> **:**<br>     vs. **:**<br> **:**<br>UBS AG, UBS FINANCIAL SERVICES, **:**<br>INC., BENEFITS ADMINISTRATIVE<br>COMMITTEE OF THE UBS **:**<br>FINANCIAL SERVICES INC. 401 K **:**<br>PLUS PLAN, ROBERT MCCORMICK **:**<br>AND JOHN & JANE DOES 1-20, **:**<br> **:**<br>     **Defendants.** **:**<br> **:** | <br><br>Case No.:<br><br>**ECF Case**<br><br><br>**CLASS ACTION COMPLAINT** |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE EMPLOYEE RETIREMENT INCOME SECURITIES ACT**

**INTRODUCTION**

1.     Plaintiff Brian Stanislaus is a participant in The UBS Financial Services Inc. 401(k) Plus Plan (the "Plan"), a defined contribution retirement plan covering the employees of UBS Financial Services, Inc. ("UBSFS"). UBSFS is a wholly owned subsidiary of UBS AG. Throughout this Complaint, UBS AG, UBSFS, and UBSFS's predecessors are referred to collectively as "UBS" or the "Company." Plaintiff makes the allegations that follow on behalf of a class (the "Class") of similarly-situated Plan participants ("Participants") during the period April 1, 2007 to the present (the "Class Period").

2.     This Complaint is based on Plaintiff's personal information and the investigation of Plaintiff's counsel. The investigation included a review of (i) documents concerning Plaintiff's

participation in the Plan; (ii) the operation and investments of the Plan; (iii) U.S. Securities and

Exchange Commission ("SEC") filings by UBS AG; (iv) Annual Reports filed by the Plan with the

SEC, the United States Department of Labor, and the Internal Revenue Service; (v) press releases;

(vi) media coverage; (vii) pleadings in other litigation; and (viii) interviews with Plan Participants.

Much of the evidentiary and factual support for the allegations below is known only to the

Defendants or is exclusively within their custody or control. Plaintiff believes that substantial

evidentiary support exists for the allegations set forth in this Complaint. Plaintiff may seek to amend

this Complaint as additional facts supporting his claims are discovered.

## OVERVIEW

3.      This is a class action brought on behalf of the Plan pursuant to §§ 502(a)(2) and (a)(3)

of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and

(a)(3), against the Plan's fiduciaries for violations of ERISA.

4.      The Plan is a defined contribution retirement plan. Throughout the Class Period, the

Plan invested in the common stock of UBS AG ("UBS Stock"), which was offered as one of the

Plan's investment alternatives through the UBS Stock Fund, a Plan investment option.

5.      During the Class Period, the Defendant fiduciaries failed to act in the best interests

of the Plan's Participants and beneficiaries, and failed to exercise the required skill, care and

prudence in administering the Plan and its assets that ERISA mandates.

6.      Specifically, Plaintiff alleges, *inter alia*, that Defendants breached their fiduciary

duties by allowing heavy, imprudent investment of Plan assets in UBS Stock throughout the Class

Period despite the fact that they knew (or should have known) that such an investment was unduly

risky and imprudent because of the Company's serious mismanagement, improper business practices,

and false financial reporting which caused UBS Stock to trade at inflated levels, without Plaintiff's knowledge.

7.    UBS Stock was an improper investment option for the Plan because, among other things, UBS:

- secretly took on huge risk as it amassed an enormous portfolio of extremely complex and risky subprime mortgage backed assets without the requisite controls to manage the corresponding risks;

- ignored, manipulated and avoided risk controls notwithstanding the enormous risks to which UBS was exposed from its subprime portfolio and other risky practices described below;

- persisted in aggressive growth of Collateralized Debt Obligations ("CDO") business, despite grave risks;

- concealed the true value of UBS's subprime holdings by manipulating asset valuations throughout the Class Period and failing to accurately account for its high-risk mortgage and CDO holdings;

- concealed UBS's exposure for counseling U.S. clients to evade U.S. tax laws;

- concealed UBS's multi-billion exposure resulting from its manipulation of the auction rate securities market;

- concealed its exposure for selling billions of dollars worth of auction rate securities that eventually because illiquid, leaving holders unable to sell; and

- repeatedly misrepresented the Company's true financial condition, causing

3

UBS's financial statements to be misleading, which artificially inflated the value of UBS Stock.

8.    In sum, during the Class Period, UBS faced undisclosed, deteriorating financial circumstances that rendered UBS Stock an unduly risky and inappropriate investment option for Participants' retirement savings. When the truth was discovered, the share price for UBS Stock fell dramatically – from a high of $66.15 in April 2007 to a low of $17.96 in July 2008. The steep decline in the price of the UBS shares and, correspondingly, the dramatic decline in the value of the UBS Stock in the Plan caused the Plan to suffer tens of millions of dollars in losses.

9.    Plaintiff alleges that Defendants, as fiduciaries of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties to him and to the other Participants and beneficiaries of the Plan in violation of ERISA §§ 404(a), 405, 29 U.S.C. §§ 1104(a), 1105, with regard to the Plan's heavy holdings of UBS Stock. Under ERISA, breaching fiduciaries must restore the Plan's losses resulting from their fiduciary breaches.

10.    Count I alleges that Defendants violated ERISA by failing to prudently and loyally manage the Plan's investment in UBS Stock. Count II alleges that Defendants breached their duty to inform the Plan's Participants by failing to provide complete and accurate information regarding the lack of soundness of UBS Stock and the riskiness of investing and holding retirement savings in UBS Stock. Count III alleges that Defendants engaged in improper conflicts of interest. Finally, Count IV alleges that the fiduciaries who were responsible for selecting, monitoring, and removing the Plan's other fiduciaries failed properly to monitor the performance of their fiduciary appointees or to remove and replace those whose performance was inadequate.

11.    This action is brought on behalf of the Plan and seeks to recover losses to the Plan

for which Defendants are personally liable pursuant to ERISA §§ 409, 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2). In addition, under §§409, 502(a)(3) of ERISA, 29 U.S.C. §§ 1109 and 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief, and, as available under applicable law, constructive trust, restitution, equitable tracing and other monetary relief.

12.    ERISA §§ 409(a) and 502(a)(2) authorize participants such as Plaintiff to sue in a representative capacity for losses suffered by a plan resulting from breaches of fiduciary duty. Pursuant to that authority, Plaintiff brings this action as a class action under Fed. R. Civ. P. 23 on behalf of all Participants and beneficiaries of the Plan whose Plan accounts were invested in UBS Stock during the Class Period.

13.    Because much of the information and documents on which Plaintiff's claims are based are solely in Defendants' possession, certain of Plaintiff's allegations are made on information and belief. When Plaintiff has the opportunity to conduct discovery, Plaintiff will, to the extent necessary and appropriate, amend this Complaint to add any other facts that further support Plaintiff's claims.

## JURISDICTION AND VENUE

14.    **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action for breach of fiduciary duty brought pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), and 28 U.S.C. § 1331.

15.    **Personal Jurisdiction.** ERISA provides for nationwide service of process in ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the Defendants are United States residents and/or conduct substantial business in the United States and, therefore, this Court has personal jurisdiction

over them. All of the Defendants are also subject to this Court's jurisdiction pursuant to Fed. R. Civ.

P. 4(k)(1)(A), because they are all subject to the jurisdiction of a court of general jurisdiction in New

York State, as they reside in New York and/or do business in the state.

16.    **Venue.** Venue is proper in this judicial district pursuant to ERISA §§ 502(e)(2), 29

U.S.C. § 1132(e)(2), because Plan Participants are located in this judicial district, the Plan was

administered in this district, some or all of the fiduciary breaches for which relief is sought occurred

in this district, UBS's United States headquarters are located in this judicial district, and/or some

Defendants are believed to reside or maintain their primary places of business in this district.

## PARTIES

**A.    Plaintiff**

17.    Plaintiff Brian Stanislaus is a resident of West Orange, New Jersey. Plaintiff was

employed by UBS from November 1997 to April 29, 2008. Plaintiff is a "Participant" in the Plan

within the meaning of § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held UBS Stock in his Plan

retirement investment portfolio during the Class Period.

**B.    Defendants**

18.    **Defendant UBS AG.** UBS AG is a global financial services company headquartered

in Zurich, Switzerland. It is, by reputation, the world's largest manager of private wealth assets and

one of the largest banks in Europe in terms of both market capitalization and profitability. UBS AG

has a major presence in the United States, maintaining American headquarters in New York City

(Investment Banking); Weehawken, New Jersey (Private Wealth); and Stamford, Connecticut

(Capital Markets). UBS AG operates retail offices located throughout the United States.

19.    UBS acts through the boards of directors of UBS AG, UBSFS, and UBSFS's

predecessors (collectively the "Board"), UBS's officers and employees, and the members of any UBS or Board committees. UBS appointed such persons and committees to perform Plan-related fiduciary functions in the course and scope of their employment. Upon information and belief, UBS AG was responsible for or had oversight responsibility for the selection of the Plan's investment options and for selecting, appointing and removing other Plan fiduciaries, and is therefore a fiduciary of the Plan. The actions of the Board, such persons and committees and/or other UBS employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*. The Company is liable for these actions.

20.     **Defendant UBS Financial Services Inc.** In 2000, UBS acquired the brokerage firm PaineWebber Group Inc., which was renamed UBS Paine Webber in March 2001. It was later re-named UBS Financial Services, Inc. In 2003, UBS re-branded all UBS business groups under the UBS name. On information and belief, UBSFS remains an operating subsidiary of UBS AG and provides wealth management services under the UBS brand name in the United States, as a registered broker dealer.

21.     Defendant UBSFS is the sponsor of the Plan. Upon information and belief, UBSFS was responsible for or had oversight responsibility for the selection of the Plan's investment options and for selecting, appointing and removing other Plan fiduciaries, and is therefore a fiduciary of the Plan.

22.     **The Benefits Committee Defendants**. Upon information and belief, one or more committees act as Plan fiduciaries who, among other things, supervise the investment of Plan assets, communicate with Plan Participants concerning Plan investment options, make decisions concerning Plan investment options, and generally provide oversight for the Plan, its assets and its investments.

7

23.    Upon information and belief, the Defendant Benefits Administration Committee of the UBS Financial Services Inc. 401(k) Plus Plan ("the Benefits Committee") and its members are Plan fiduciaries who supervise the investment of Plan assets, communicate with Plan Participants concerning Plan investment options, make decisions concerning Plan investment options and generally provide oversight for the Plan.

24.    Defendant Robert McCormick served as a member of the Benefits Committee during the Class Period, and thus is a fiduciary of the Plan.

25.    Defendants John and Jane Does (1-10) are members of the Benefits Committee or such other committee that supervises the investment of Plan assets, communicates with Plan Participants concerning Plan investment options, makes decisions concerning Plan investment options and/or generally administers the Plan's assets and/or investments. The identities of these Doe Defendants are currently unknown to Plaintiff. Once Plaintiff ascertains their identities, Plaintiff will endeavor to join them under their true names.

26.    **The Director Defendants.**  The Board is the governing body of UBS. Upon information and belief, the Board, or its designees, have certain responsibilities with respect to the Plan. The Board and its members are, upon information and belief, fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercise discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets. Upon information and belief, the Board or its designees had the authority and discretion to appoint, monitor, and remove individual directors, officers and employees from their individual fiduciary roles with respect to the Plan.

27.    Defendants John and Jane Does (11-20) are or were members of the Board who

8

served as fiduciaries of the Plan during the Class Period, and who appointed and oversaw the Plan administrators and other appointed Plan fiduciaries. The identities of these Doe Defendants are currently unknown to Plaintiff. Once Plaintiff ascertains their identities, Plaintiff will endeavor to join them under their true names.

## THE PLAN

28.     The Plan is a defined contribution plan sponsored by UBSFS that provides retirement benefits to eligible UBSFS employees. *See* Form 11-K Annual Report FYE 12/31/06, dated July 5, 2007 ("2006 11-K") at 4.

29.     The Plan is a legal entity that can sue and be sued and is an "employee pension benefit plan," as defined by § 502(d)(1), 29 U.S.C. § 1132 (d)(a). However, in a breach of fiduciary duty action such as this, the Plan is neither a defendant nor a plaintiff. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its Participants and beneficiaries.

30.     The Plan is administered by the Benefits Committee, which files the Annual Report on Form 11-K for the Plan with the SEC, and such other committees that may exist that are currently unknown to Plaintiff.

31.     The assets of an employee benefit plan, such as the Plan here, must be "held in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class Period, the assets of the Plan were held in a Master Investment Trust ("Master Trust") which is administered by The Northern Trust Company. *Id.* at 5. The Master Trust was established on January 1, 2000. *Id.*

32.     The Plan became effective on October 1, 1979, and has been amended from time to time. The Board retains authority to amend the Plan. *Id.* at 4.

33.    At the end of 2006, there were 21,305 Plan participants. *Id.*

34.    Throughout the Class Period, the Plan offered various investment options for participant contributions, including the UBS Stock Fund, which consisted, almost exclusively, of UBS Stock. *Id.* at 8. On information and belief, the UBS Stock Fund was not a required feature of the Plan.

35.    The Plan includes four types of contributions: Participant contributions, UBSFS match, UBSFS retirement contribution, and a qualified deferred payment. *Id.* at 5. The Plan's assets are invested in the Master Trust, which in turn, invests in the UBS Stock Fund, among other funds and accounts. *Id.*

36.    UBSFS contributes a Company match to each Participant's account by multiplying each Participant's contributions (up to 6% of eligible compensation) by 50%. The UBSFS match is limited to $3,000. *Id.* at 6. UBSFS also provides a retirement contribution equal to a percentage of the Participant's eligible compensation based on the Participant's years of service. *Id.*

37.    Each Participant has two accounts – an Employee Account and a UBSFS Account which are managed as a single account. Only one asset allocation can be selected and is applicable to both accounts. Participants are immediately vested in their Employee Account and are fully vested in the UBSFS Account after three years, when they reach age 65 or when they become disabled or die. *Id.* at 8.

38.    The UBS Stock Fund is one of the largest investments in the Master Trust. In December 2006, the UBS Stock Fund held $724,881,686 worth of UBS Stock (30,610,190 shares). *Id.* at 12.

39.    Whether to stop offering UBS Stock as a Plan investment option is a discretionary

decision that the Plan's fiduciaries were required to consider. Upon information and belief, the Plan does not limit the ability of the Plan's fiduciaries to consider removing the UBS Stock Fund as an investment option, as prudence requires.

40.    The Plan has incurred substantial losses as a result of the Plan's investment in UBS Stock. The UBS Stock price has plummeted on revelations of the Company's serious mismanagement and improper business practices, including, among other practices, its failure to account properly for high-risk mortgage and CDO holdings, tax evasion schemes for U.S. clients, and its rigging of the auction rate securities markets.

## DEFENDANTS' FIDUCIARY STATUS

### A.    The Nature of Fiduciary Status

41.    **Named Fiduciaries.** ERISA requires every plan to provide for one or more "named fiduciaries" who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A). Upon information and belief, the Benefits Committee is the named fiduciary of the Plan.

42.    *De Facto* **Fiduciaries.** ERISA not only treats persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), as fiduciaries, but also establishes that any other person who in fact performs fiduciary functions is a fiduciary. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any

11

moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

43.    Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and its Participants and beneficiaries under ERISA in the manner and to the extent set forth in the Plan's documents and under ERISA.

44.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's Participants and beneficiaries and with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

**B.    UBS AG's Fiduciary Status**

45.    On information and belief, UBS AG is charged with or has oversight responsibility regarding the appointment, monitoring, and removal of the Benefits Committee and any other committees that oversaw the Plan's assets and investments. In addition, on information and belief, UBS AG bore responsibility for the selection of the investment options offered by the Plan. DOL regulations make clear that these are fiduciary functions under ERISA, 29 C.F.R. § 2501.75-8. Moreover, UBS AG, at all applicable times, exercised control or oversight responsibility over the activities of UBS employees that performed fiduciary functions with respect to the Plan, and can appoint or terminate and replace such employees at will. Under basic tenets of corporate law, UBS AG is imputed with the knowledge that the Defendants knew or should have known.

46.    In light of the foregoing duties, responsibilities and actions, UBS AG was a fiduciary

of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in

that it exercised discretionary authority or discretionary control with respect to the management of

the Plan, exercised authority or control with the respect to the management or disposition of the

Plan's assets and/or had discretionary authority or discretionary responsibility concerning the Plan's

administration.

47.    UBS AG, as a corporate entity, cannot act on its own without any human counterpart.

Thus, during the Class Period, on information and belief, UBS AG relied upon certain of the other

Defendants, including the John and Jane Doe Defendants, to carry out its fiduciary responsibilities

under the Plan and ERISA.

**C.    UBSFS's Fiduciary Status**

48.    UBSFS is the sponsor of the Plan. On information and belief, UBSFS is charged with

or has oversight responsibility regarding the appointment, monitoring, and removal of the Benefits

Committee and any other committees that oversaw the Plan's assets and investments. In addition,

on information and belief, UBSFS bore responsibility for the selection of the investment options

offered by the Plan. DOL regulations make clear that these are fiduciary functions under ERISA,

29 CFR § 2509.75-8. Moreover, UBSFS, at all applicable times, has exercised control or oversight

responsibility over the activities of its employees that performed fiduciary functions with respect to

the Plan and can appoint or terminate and replace such employees at will. Under basic tenets of

corporate law, UBSFS is imputed with the knowledge that its employees knew or should have

known.

49.    In light of the foregoing duties, responsibilities and actions, UBSFS was a fiduciary

of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in

that it exercised discretionary authority or discretionary control with respect to the management of the Plan, exercised authority or control with the respect to the management or disposition of the Plan's assets and/or had discretionary authority or discretionary responsibility concerning the Plan's administration.

50.    UBSFS, as a corporate entity, cannot act on its own without any human counterpart. Thus, during the Class Period, on information and belief, UBSFS relied upon certain of the other Defendants, including the John and Jane Doe Defendants, to carry out its fiduciary responsibilities under the Plan and ERISA.

**D.    The Benefits Committee Defendants' Fiduciary Status.**

51.    The Benefits Committee was, upon information and belief, the administrator of the Plan and/or named fiduciary as those terms are defined in ERISA, with the authority to manage and control the operation and administration of the Plans.

52.    In addition, on information and belief, the Benefits Committee exercised responsibility for communicating with Plan Participants about the Plan and for providing Participants with information and materials required by ERISA.    In this regard, the Benefits Committee disseminated the Plan documents and related materials which incorporated by reference UBS's misleading SEC filings, thus converting such materials into fiduciary communications.

53.    In light of the foregoing, the Benefits Committee Defendants were both named and *de facto* fiduciaries within the meaning of ERISA.

**E.    The Director Defendants' Fiduciary Status.**

54.    Under UBS's charter and bylaws, the Board has the authority to manage the business and affairs of UBS.    Moreover, upon information and belief, the Director Defendants are charged

with authority to appoint, monitor and replace Plan fiduciaries, which constitutes fiduciary duties with respect to the Plan. Thus, according to DOL regulations, the Director Defendants exercised a fiduciary function under ERISA. 29 C.F.R. § 2509.75-8.

55.    In light of the foregoing duties, responsibilities, and actions, the Director Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period, in that they exercised discretionary authority or control over the management of the Plan, its assets and/or its administration.

## FACTUAL BASIS OF THE FIDUCIARY BREACHES

**A.    UBS Common Stock Was an Imprudent Investment for the Plan during the Class Period Because of the Company's Serious Mismanagement, its Misrepresented Investment in High-Risk Subprime Investment Vehicles and Disregard for Applicable Risk Management Controls, its Fraudulent Dealings in the Auction Rate Securities Markets, its False Financial Reporting, and its Rapidly Deteriorating Financial Condition.**

### 1.    Summary

56.    During the Class Period, UBS was plagued by severe internal mismanagement and turmoil that rendered UBS Stock an imprudent retirement investment for the Plan. As a result of these problems, UBS Stock posed an unduly large risk of significant loss, and this risk is not one that could be prudently borne by an employee retirement plan.

57.    The risks posed by the Plan's investment in UBS Stock were greatly enhanced by UBS's false and misleading statements throughout the Class Period that caused UBS's stock to trade at artificially inflated prices. A fiduciary's duty of prudence includes a duty not to ignore circumstances, such as those discussed below, which increase a participant's risk of loss or which cause the overall magnitude of that potential loss to rise to an imprudent and unacceptable level.

58.     The risk of large loss in the UBS Stock Fund arose as a result of a variety of factors, including but not limited to, three major issues that, when discovered, caused UBS stock's price to plummet from its inflated levels; these are:

(1)     UBS's rapid expansion into, and unchecked exposure to, high-risk mortgage-backed securities, such as CDOs and other complex financial products, and its concentration on business directly affected by the tightening mortgage market and credit markets. These events caused UBS to write-down, to date, a shocking **$43 billion** of assets in the past year – one of the largest losses in the history of banking – and further write-downs are anticipated;

(2)     UBS's involvement in pumping up the auction-rate securities market. This market dried up during the Class Period, causing UBS's clients to have illiquid securities and opening UBS to massive liability – UBS recently agreed to buy back **$8.3 billion** of auction rate securities that it had sold individual retail customers; and

(3)     UBS's involvement in widespread tax evasion schemes for U.S.-based UBS clients that subjected UBS to significant liability.

59.     UBS's notorious $43 billion-plus asset writedown is the direct consequence of UBS's aggressive plan to grow its historically conservative wealth management business into the world's most profitable investment bank. In an attempt to achieve this goal, UBS ignored risk management practices and other controls, and plunged into a variety of high risk trading strategies employed by UBS's New York and Connecticut-based investment banking and hedge fund operations.

60.     Throughout 2006 and 2007, UBS amassed $100 billion in U.S. residential mortgage-

16

backed securities ("RMBS") and CDOs backed mainly by U.S. subprime mortgages. This was in violation of the Company's risk management policies and contrary to its public representations.

61.    Defendants went to extraordinary lengths to conceal the true financial condition of UBS. For instance, initially, UBS hid the magnitude of its exposure to subprime losses by providing a positive outlook for the Company when the Defendants knew, or should have known, that the Company's true financial condition differed from its more rosy public statements.

62.    As shown below, Defendants' material misrepresentations and omissions caused the price of UBS's common stock to become artificially inflated. When the truth was disclosed, the price of UBS's common stock trading on the NYSE fell from a Class Period high of $66.15 per share on April 26, 2007 to $21.04 on the last trading day of the week before the case was filed.

### 2.    UBS Jettisons Its Fiscal Conservatism and Plunges Into High Risk Securities Speculation, Acquiring A Risky $100 Billion Dollar Subprime Stake

63.    Since its inception, UBS has held itself out as a model institution for conservative wealth and risk management. In 2000, UBS embarked on a plan to expand its investment banking business in the U.S. market. To effectuate its goal of becoming a top-tier U.S.-based investment bank, UBS created an internal hedge fund, Dillon Read Capital Management ("Dillon Read"), and eventually purchased a $100 billion position in fixed-income assets, such as CDOs and RMBS backed by subprime mortgage collateral.

64.    Subprime loans are characterized as high-risk loans because they typically have high loan-to-value ratios ("LTV Ratio") or are made to individuals with low credit scores (*i.e*, FICO scores of 625 or lower) and/or to individuals with no documented source of income.

65.    During the mid-2000s, UBS assured investors, including Plan Participants, that it

17

employed and followed the most stringent risk management policies and controls in the industry and that its risk management controls would preclude UBS from acquiring high concentrations of any single asset type or assets that were, or could become, illiquid.

66.     UBS's claimed adherence to strict risk management arose, in part, as a result of its approximately $680 million loss in 1998 from the Company's investment in the Long Term Capital Management ("LTCM") hedge fund. LTCM experienced great success during its first few years of operation. Seeking to take advantage of the hedge fund's success, UBS invested more than $1 billion in LTCM in 1997 – more than any other investor. One year later, LTCM's collapse nearly caused a worldwide financial crisis.

67.     Following the LTCM debacle, UBS repeatedly assured investors that it would avoid acquiring illiquid and concentrated positions in any assets, including fixed-income ones. Moreover, UBS represented that while it was growing its mortgage and asset-backed securities business, it was focused on avoiding "illiquid and concentrated positions" and was actively following "risk distribution strategies."

68.     Notwithstanding these representations, UBS amassed a *$100 billion* portfolio concentrated exclusively in RMBS and CDOs backed by U.S. subprime mortgages – in an increasingly risky U.S. real estate market. It did so without adequately disclosing to investors, including Plan Participants: (i) the true nature and concentration of the Company's investments; (ii) the true value of these investments; or (iii) the fact that core risk policies designed to prevent UBS from accumulating such a high concentration of one asset type were being overridden or ignored.

69.     In July 2005, after receiving a report indicating that UBS was behind the other top

18

U.S. investment banks in revenues generated from fixed income assets, the UBS Investment Bank (the "IB") set out to "catch-up" by acquiring massive amounts of subprime-backed RMBSs and CDOs. Although UBS's internal risk management team warned against acquiring potentially risky illiquid subprime-backed assets without exercising tight risk controls, the IB pressed ahead without these controls in place. However, UBS reassured investors, including Plan Participants, throughout the Class Period that strict risk controls were in place when they were not.

70. In its April 21, 2008 Shareholder Report on UBS's Writedowns (the "Shareholder Report"), UBS admitted that "the IB management did at no stage conduct a robust independent assessment of its overall subprime exposures." (Shareholder Report at 35). Moreover, UBS manipulated the limited risk management controls that the IB had in place in an effort to recognize revenue from the origination, underwriting and retention of high-risk subprime mortgage-backed securities.

71. Although UBS was assuring investors that it was avoiding high concentrations of specific asset classes, between February 2006 and September 2007, the IB acquired at least $50 billion in "super senior" tranches of subprime backed mezzanine CDOs, and at no time relevant hereto did Defendants disclose the full nature or extent of the multi-billion dollar investment to UBS shareholders or Plan Participants.

72. Defendants manipulated UBS's risk management controls to increase UBS's fixed income investments in response to management's desire for growth. For instance, as the *Financial Times* reported on April 21, 2008, UBS eluded risk controls by "taking AAA-rated [subprime] bonds and then buy[ing] protection against the risk of the securities losing 2 percent of their value. UBS risk models then assumed AAA-rated [subprime] bonds would never receive less than 98 percent

of their face value. With the additional protection, the [highly risky] assets were regarded as almost 'risk-free.'" Chris Hughes, Haig Simonian and Peter Thai Larsen, *Corroded to the Core*, *Financial Times* April 21, 2008.

73.    By manipulating UBS's risk metrics, UBS acquired exponentially more RMBS and CDO positions than it would have been able to acquire had UBS complied with its risk management processes.

74.    UBS also acquired tens of billions in synthetic and hybrid CDOs tied to subprime mortgage-backed assets, thereby increasing UBS's exposure to the highly risky U.S. subprime mortgage market. A synthetic CDO is one step removed from a traditional or cash CDO, which is backed by subprime RMBS. UBS has admitted that retention of its unfunded tranches of synthetic CDOs was one of the "key drivers" of the accumulation of UBS's $50 billion CDO position that caused $9.15 billion of UBS's write-downs as of December 31, 2007.

75.    During the Class Period, UBS assured investors, including Plan Participants, that UBS avoided concentrations of risk and specific assets. Defendants knew, however, that UBS had accumulated a $100 billion subprime mortgage backed-asset portfolio as the U.S. real estate market faced the risk of rapidly declining; the quality of subprime mortgages was deteriorating at an unprecedented pace; subprime mortgage-backed assets were losing value and becoming illiquid; and UBS's subprime mortgage-backed holdings were materially overvalued.

76.    UBS continued to amass UBS's subprime mortgage-backed RMBS and CDO portfolios throughout the Class Period in contravention of representations to the market that UBS would not take on high concentrations in any given type of asset or in illiquid assets. Additionally, in direct contravention of Company policy and international accounting standards, Defendants

refused to properly value UBS's RMBS and CDO portfolios when they discovered that the portfolios were materially overvalued.

### 3.   The Housing Market Collapses, UBS Tries to Conceal Its Losses, And Takes Massive Writedowns

77.    By early 2007, the U.S. real estate market was well in the midst of a sharp decline from its 2005 peak, as property values plummeted and mortgage defaults soared.  Declining property values coupled with rising interest rates caused delinquency rates for U.S. residential subprime mortgages to rise dramatically.  Additionally, the Housing Price Index, which measures the level of U.S. real estate values, began a dramatic decline in 2006 which continued through 2007.  On February 8, 2007, HSBC Holdings, the world's largest banking group, issued a profit warning due to losses suffered on its U.S. subprime lending operations.  HBSC further announced a $10.86 billion impairment charge related to its subprime assets.  At the same time, one of America's biggest housing lenders, New Century Financial Corp., also predicted a fourth quarter loss and restatements of each of the previous three quarters earnings, because it had failed to set aside enough money to buy back bad subprime loans.

78.    As a result, in March, Dillon Read hedge fund manager John Niblo slashed his hedge fund's valuation of securities tied to subprime mortgages by about 20%, or nearly $100 million. UBS management was reportedly irate at Mr. Niblo's actions because UBS was carrying similar securities on its books at far higher valuations.  In conference calls, UBS management interrogated Mr. Niblo about his actions and continued carrying the securities on their books at far higher prices. They fired Mr. Niblo in August 2007.

79.    By not writing down its position, UBS violated applicable accounting rules that required UBS to value its entire $100 billion mortgage-backed asset portfolio according to readily observable market pricing. UBS did not disclose that it had violated these rates. Instead, UBS falsely assured investors, including Plan Participants, that the values UBS carried on its books were genuine, that the Company was extremely careful with the valuation process, and that the Company was going out to the market to get quotes on its positions.

80.    When the Board learned of the Dillon Read write-downs, it ordered an internal audit of Dillon Read valuations in March 2007. The fact that the audit culminated in an April 2007 report that warned of "valuation uncertainties" and "inherent risks not adequately analyzed" was not disclosed to shareholders, including Plan Participants, until February 14, 2008. UBS omitted this material information from UBS's financial reports at the time and further concealed that it continued to record tens of billions of dollars in subprime-backed RMBS and CDOs on UBS's balance sheet at materially inflated prices.

81.    On May 3, 2007, UBS announced that Dillon Read had suffered a first quarter loss of CHF (Swiss Francs) 150 million. UBS told investors it was disappointed with Dillon Read's results and was closing that division because of operational issues regarding the management structure of the hedge fund. At no time did UBS disclose that Dillon Read had written-down more than $400 million in RMBS and CDOs backed by subprime collateral that were virtually identical to the other subprime-backed assets on UBS's balance sheet. On the Company's May 3 and August 14, 2007 earnings calls, when asked about UBS's subprime exposure, UBS indicated no problems existed and expressed confidence in their positions.

82.    UBS also led investors and Plan Participants to believe that Dillon Read was a

22

success by paying a 16.5 % return on investment to third-party investors upon the dissolution of the Outside Investor Fund ("OIF"), which Dillon Reed had launched as a small third-party investor fund in November 2006. OIF investors had contributed $1.3 billion to the fund, which UBS used to acquire additional positions in subprime mortgage-backed RMBS and CDOs between November 2006 and April 2007. UBS closed OIF in May 2007 and returned the $1.3 billion to investors with a 16.5% return to make it appear that it had been profitable. UBS actually paid outside investors at the expense of UBS shareholders.

83.    In the end, Dillon Read's strategies during its 11-month existence led to the accumulation of $20 billion in subprime mortgage-backed assets.

### 4.    UBS Starts to Reveal Massive, Unprecedented Losses

84.    UBS misrepresented and concealed the truth about their highly illiquid, risky subprime mortgage-backed assets, and misrepresented the stated value of those subprime holdings until October 30, 2007, when UBS began to gradually reveal the extent of the Company's losses, which have still not been fully disclosed. This occurred as follows:

- On October 30, 2007, UBS filed its quarterly report for the third quarter of 2007 with the SEC. UBS wrote-down **$4.4 billion** in subprime related RMBS and CDOs. However, the stock remained artificially inflated because UBS assured investors that UBS had provided "the maximum possible transparency to the bare bone" with respect to its exposure to the U.S. real estate market.

- On December 10, 2007, UBS issued a press release announcing that it would write-down its U.S. subprime holdings by a further **$10 billion**. It also revised its 4Q outlook from an overall profit to a possible net loss for the full year 2007 in response

to continued deterioration in the U.S. subprime mortgage securities market driven by increased homeowner delinquencies.

- On January 30, 2008, the Company issued a press release pre-announcing its results for the full-year and fourth quarter of 2007. UBS announced that it had written-down an additional **$4 billion** as of December 31, 2007, and would possibly record a net loss for full-year 2007.

- On February 14, 2008, UBS announced that its write-down for fiscal year 2007 totaled **$18.7 billion**, causing UBS to take its first ever annual loss.

- After convincing shareholders to approve a CHF 13 billion mandatory convertible bond offering, on April 1, 2008, UBS announced an additional **$19 billion** write-down of subprime mortgage-backed assets. This writedown brought the Company's total subprime write-downs to **$38 billion** and followed assurances that UBS had already taken the worst of the write-downs.

- On April 16, 2008, the Company advised shareholders that they would receive a considerably lower dividend for 2007 than in previous years because of the subprime related write-downs.

- On May 6, 2008, the Company announced an **$11.5 billion** loss for the first quarter of 2008 as a result of the **$19 billion** writedown announced in April. The Company also stated that it would lay off approximately 7% of its workforce and that it was in talks to sell roughly **$15 billion** in mortgage-backed assets.

- On July 4, 2008, UBS announced that it recognized further, not yet quantified write-downs of its remaining subprime mortgage-backed positions in 2Q 2008. Analysts

estimate that UBS's write-down could exceed **$7.5 billion.** *See Haig Simonian, UBS Faces More US Credit Writedowns, Financial Times,* July 4, 2008.

- On August 12, 2008, UBS announced plans to reorganize into three distinct businesses after reporting a large quarterly loss ($331M) and announced that it was taking another **$5.1 billion** in write-downs, bringing its total losses to **$43 billion** with more expected.

**5.    <u>Widespread Terminations & Resignations Occur</u>**

85.    The foregoing misconduct has led to widespread terminations and resignations of UBS's highest ranking officers and directors:

- On March 15, 2007, the co-chief investment officer at Dillon Read unexpectedly resigned.

- On May 3, 2007, UBS announced that Chief Financial Officer Hutchins would be leaving UBS and that the CEO of Dillon Read would be stepping down.

- In June 2007, UBS placed John Niblo, the Dillon Read trader who attempted to write-down the value of his mortgage-backed securities portfolio, on administrative leave and eventually fired him.

- On July 5, 2007, UBS terminated Chief Executive Officer Peter Wuffli.

- In mid-August 2007, UBS terminated Simon Bruce, the head of UBS's Fixed Income Division.

- On October 1, 2007, the CEO of the IB, Huw Jenkins, and Clive Standish, the CFO of UBS, left UBS.

- Later in October 2007, UBS terminated IB employees David Martin and James

25

Stehli, who ran the IB's rates business and CDO desk, respectively.

- Marcel Ospel resigned as UBS's Board Chairman on April 23, 2008.

- On August 4, 2008, UBS announced that David Aufhauser, general counsel of the IB, stepped down.

### 6. **Governmental Investigations Ensue**

86.    Widespread governmental investigations are also underway.  In October 2007, the SEC commenced an initial investigation into whether UBS properly valued its subprime-related asset portfolio.  The *Wall Street Journal* reported "the agency is examining, among other things, a situation last year in which a trader at a now-defunct hedge fund of UBS's Dillon Read unit was confronted and then ousted after he valued mortgage securities at prices below the value assigned to the same securities elsewhere at UBS."  *Kara Scannell, Anita Raghavan and Amir Efrati, The Suprime Cleanup Intensifies, Wall Street Journal,* Feb. 2, 2008.

87.    In December 2007, Switzerland's federal banking regulator, the Swiss Federal Banking Commission ("SFBC") announced that UBS's losses in the U.S. resident mortgage market were under investigation.  This investigation broadened in early April 2008 to determine whether UBS "breached market disclosure regulations", given UBS's revelation on April 1, 2008 that it was writing down an additional $19 billion in subprime mortgage-backed assets.

88.    In June 2008, the Commonwealth of Massachusetts charged UBS with fraud and dishonest conduct in connection with their sales of auction rate securities to investors.

89.    The New York State Attorney General sued UBS on July 25, 2008, accusing the Company of a multi-billion dollar fraud related to UBS's practice of deceptively steering clients to purchase auction-rate securities that UBS claimed were liquid investments, even after the market for

these securities dried up and they became impossible to sell.

90.     On August 14, 2008, New Hampshire securities regulators sued UBS for improperly selling auction rate securities to students hoping to finance their education.

91.     UBS has since announced a settlement with various state and federal regulators by which it agreed to pay a $150 million fine and agreed to buy back **$8.3 billion** of auction-rate securities it had sold to individual retail customers.  UBS also agree to assist institutional investors holding another **$10.3 billion** in such holdings.

**7.     The UBS Shareholder Report**

92.     UBS agreed to provide SFBC with a report detailing the reasons behind its $18.7 billion asset write-downs between October 30, 2007 and December 31, 2007.  In March 2008, UBS issued a 400-page report to the SFBC, which has not been made available to the public.  The 50-page summary Shareholder Report was released on April 21, 2008, two days before the Company's annual meeting.  This summary admits:

a.     Between 2005 and 2007, UBS acquired a massive $50 billion stake in "super senior" CDO bonds backed by high-risk subprime mortgages as a result of its focus on profit maximization and in complete disregard for the Company's stated risk policy and Class Period representations that UBS would not accumulate high concentrations of a specific asset type (Shareholder Report at 15);

b.     These positions were accumulated by UBS as part of a growth plan that "focused on the maximization of revenue" and did not consider the risk capacity. . . associated with the recommended product expansion"

27

(Shareholder Report at 34);

    c.     As a consequence, there was an overarching "lack of challenge on the risk and reward to business area plans within the [IB] at a senior level," and an "asymmetric focus in [IB] Senior Management meetings on revenue and P& L, especially when compared to discussions of risk issues" (Shareholder Report at 34).

93.    The Shareholder Report explained that three distinct business within UBS amassed large subprime investments. These were Dillon Read (16% of the losses); the IB's Fixed Income Business area's Rate business (66% of the losses); and the IB's Foreign Exchange/Cash Collateral Trading business (18% of the losses). (Shareholder Report at 7).

94.    Through its Shareholder Report, UBS admitted that "oversight arrangements for [Dillon Read] were relatively complex and reflected a non-standard governance model." *Id.* at 10. UBS admitted that Dillon Read operated a number of trading strategies involving subprime positions, including ABS Relative Value, Reference Linked Notes ("RLN"), ABS CDO Trading, and US Short Term Asset Backed Portfolio. *Id.* 12-13. Failure to mitigate fully the impact of a tail event was believed to have caused Dillon Read's RLN losses. *Id.* at 31. Insufficient accounting for the risk of divergent movements between asset classes or instruments, insufficient attention to idiosyncratic risk factors (i.e., the risk of price changes due to unique circumstances of a specific security),  and an over-reliance on AAA ratings were blamed for the other Dillon Read losses. *Id.*

95.    The Shareholder Report also indicated that the creation of Dillon Read took senior fixed income managers from the IB, leaving that institution without experienced leadership. *Id.* at

33. It also reported that UBS did not properly oversee Dillon Read, which became a distraction for senior management. *Id.*

96.    The CDO desk within the IB was the primary contributor to UBS's 2007 subprime write-downs, according to the Shareholder Report. The CDO desk entered into transactions related to U.S. subprime residential mortgages principally through CDO securitization and through the purchase and retention of CDO "super senior" positions. *Id.* at 13.

97.    The CDO desk acquired "CDO Warehouse" positions. In the initial stage of CDO securitizations, the CDO desk would enter into an agreement with a collateral manager. These positions were held in a "CDO Warehouse" in anticipation of securitization into CDOs. The CDO Warehouse was a significant contributor to Value at Risk and stress limits applicable to this business. *Id.* By the end of 2007, losses on positions held in the CDO Warehouse represented approximately 16% of UBS's total subprime losses. *Id.*

98.    The Shareholder Report indicated that the fragmented approval structure for the CDO business, potential conflicts of interest, absence of risk management, lack of operational/notational limits, incomplete risk control methodologies, and UBS's funding framework all contributed to CDO Warehouse losses. *Id.* at 29-30.

99.    The CDO desk also retained "super senior" tranches of CDOs – the higher rated tranches of CDOs – on its books instead of selling them to third party investors in a risky effort to maximize profits. Losses on these "super senior" positions were responsible for about 50% of UBS's total subprime losses and were caused by the funding framework, lack of monitoring/visibility, lack of notational limits, absence of specific approval process for unhedged positions, and incomplete capture of risk attributes by risk control. *Id.* at 14 and 30-31.

100.  UBS admitted that "there was no comprehensive view available of the gross notational holdings with Subprime exposure across the IB." *Id.* at 21. Moreover, the Shareholder Report noted that Fixed Income's growth orientation, lack of internal oversight and challenging of the IB's fixed income strategy, and use of inappropriate risk metrics in strategic planning and assessment contributed to the subprime losses at the IB. *Id.* at 34.

101.  Throughout the Shareholder Report, UBS blamed IB governance, the funding framework and risk management as causes of the subprime losses. *Id.* 34-38. In particular, UBS admitted that there were "gaps in risk management expertise/experience" at the IB's senior levels, there was a "failure to respond to wider industry concerns," and a lack of fundamental analysis of the subprime issues. *Id.* at 37-38.

102.  In particular, the Shareholder Report reported that UBS concluded that its risk monitoring tools had been inadequate. The Shareholder Report faulted time series reliance, lack of housing market risk factor loss limits, over-reliance on VaR and Stress numbers, over-reliance on ratings, and lack of comprehensive subprime risk assessment. *Id.* 38-39.

103.  In the Shareholder Report, UBS further admitted that its Market and Credit Risk reports "did not, however, communicate an effective message", *id.* at 39, and that UBS's compensation structure contributed to the subprime losses. *Id.* at 41-42.

### 8.    UBS's Fraud Extends Beyond the Subprime Debacle

104.  UBS also misrepresented and failed to inform investors of material risks it faced in connection with auction rate securities.

105.  Auction rate securities are long-term bonds with interest rates that are reset and determined through a Dutch auction process. During the Class Period, and unbeknownst to investors

and Plan Participants, the term "auction" was a misnomer because the rates for these securities were not set in a true bidding process. UBS expressly represented to customers that these investments were liquid, safe money-market instruments. The reality, well known to the Defendants, but not to UBS's customers, was that there were no true auctions for many of these securities. Often, there was insufficient interest on the part of any buyers for auction rate securities. In those situations, UBS would simply purchase unwanted securities, thereby creating false demand and liquidity for the products and making them appear to continue to be viable, liquid investments.

106.    As a result of this practices, and unbeknownst to Plan Participants, UBS acquired at least $5.9 billion in auction rate securities during the Class Period in direct contravention of its representations to investors that UBS avoided accumulating both high concentrations of any given asset type, and illiquid assets.

107.    In February 2008, the market for auction rate securities crashed and investors were unable to sell securities that UBS had represented were highly liquid. Internal emails between UBS executives have surfaced indicating that UBS executives knew that the market for those securities was deteriorating as early as August 2007. Instead of informing investors and clients of the illiquidity of the market, UBS continued to tout auction rate securities as highly liquid cash alternatives. Additionally, the Company's internal emails indicate that UBS secretly began a campaign to unload UBS's auction rate holdings on its unsuspecting clients in an attempt to limit UBS's own risk exposure in the deteriorating market, while at the same time purchasing some auction rate securities in order to support the auctions.

108.    On March 28, 2008, UBS announced that it would begin marking down the value of the auction rate securities held by investors, and that starting in April 2008, UBS would no longer

call auction rate securities as "cash equivalents" on customer statements, instead referring to them as "fixed income securities." On May 6, 2008, UBS wrote down its auction rate holdings by $974 million.

109.    On May 7, 2008, following an investigation by the Massachusetts Attorney General into UBS's auction rate securities practices, UBS agreed to pay Massachusetts agencies, towns and cities $35 million for its alleged fraud against them.

110.    On June 26, 2008, the Massachusetts Securities Commission filed an administrative proceeding against UBS, alleging that UBS had knowingly defrauded its auction rate clients.

111.    On July 24, 2008, New York Attorney General Andrew Cuomo filed suit against UBS, claiming that the Company sold and marketed auction rate securities as safe, cash-equivalents even though they became liquidity risks when the auction rate market failed.

112.    The New York complaint against UBS contained a withering portrayal of what it termed a "multibillion-dollar consumer and securities fraud." According to that complaint, UBS executives unloaded more than $21 million of their personal holdings of auction-rate securities as they realized the market was in trouble. In December, UBS's trading desk manager sent an email to the global head of municipal securities saying, "The auction product does not work." Other emails referred to the securities as a "huge albatross" for the firm and a "scary and delicate" situation.

113.    On August 8, 2008, UBS agreed to pay a $150 million fine and buy back $18.6 billion in failed auction-rate securities under a settlement with the New York State Attorney General, the SEC and a group of other state regulators.

114.    UBS's Wealth Management division is the subject of a U.S. Department of Justice investigation into whether UBS aided wealthy U.S. clients in evading more than $300 million in U.S.

taxes during 2000-2007.

115.    On June 19, 2008, a senior UBS Wealth Management executive testified that UBS explicitly advised American clients on how to evade U.S. taxes by urging clients to destroy records, lie to customs officials, hide tangible assets, and use Swiss credit cards so the U.S. IRS could not track purchases.

116.    The SEC is conducting a separate investigation concerning whether UBS employees in Switzerland, who advised U.S. clients, failed to comply with SEC registration rules.

117.    On August 14, 2008, it was reported in the *New York Times* and *Financial Times* that UBS senior executives had been alerted three years ago of possible violations of U.S. securities laws in their dealings with American clients of its private bank, according to internal letters produced to U.S. regulators. UBS, allegedly, ignored the warnings.

**B.    Defendants Knew or Should Have Known that UBS Stock was an Imprudent Investment for the Plan**

118.    Given the facts described above, UBS and the other Defendants knew that UBS Stock was an imprudent investment for the Plan. As detailed above, Defendants knew that UBS faced dire risks due to its subprime, CDO, auction rate securities and tax fraud exposures, all of which caused UBS's financial statements to be misleading and artificially inflated the value of UBS Stock held by the Plan. Defendants also knew, or should have known, that UBS had been disregarding sound business practices and circumventing risk-management processes despite numerous warnings.

119.    Therefore, at all relevant times, Defendants knew or should have known that UBS Stock was an imprudent investment for the Plan due to the numerous operational, risk management,

and disclosure deficiencies described above.

120.    All Defendants, and particularly the Board Defendants, as top executives and high-level officers at UBS were in the position to know of several "red flags" that should have caused them to investigate the risks the Plan faced as a result of its huge investment in UBS Stock.

121.    Given the size of the Plan's investment in UBS Stock and the turmoil faced by the subprime and, later, the auction rate securities markets, prudent Plan fiduciaries were required to fully investigate UBS, based on their knowledge as Company insiders, and to carefully monitor the Plan's investment in UBS Stock. Defendants were duty-bound to take appropriate actions to protect the Plan and its Participants. Instead, Defendants did nothing. Defendants utterly disregarded sound business practices and failed to implement appropriate risk management processes throughout the Class Period.

122.    Compounding both the problem and the losses to the Plan was the fact that Defendants downplayed the risks faced by the Company, falsely assuring both the market and Plan Participants that investments in UBS Stock were not in danger. Defendants' failure to disclose the true risks the Plan faced as a result of its investment in UBS Stock resulted in the Plan purchasing and holding huge amounts of unduly risky UBS Stock at inflated prices.

123.    Prudent fiduciaries of the Plan would not have ignored the numerous red flags that surfaced throughout the Class Period, and would not have allowed the risk of loss to the Plan, its Participants and beneficiaries to increase to unacceptable levels. Unfortunately, the Defendants allowed that to happen, thereby loading to the loss of a huge portion of the Plan's assets.

124.    During the Class Period, Defendants failed to conduct an appropriate investigation into whether UBS Stock was a prudent investment for the Plan. An adequate

investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in UBS Stock, under the circumstances, was clearly imprudent. A prudent fiduciary, armed with this knowledge, would have made vastly different investment decisions concerning the propriety of the Plan's UBS Stock investment.

125.    Because Defendants knew, or should have known, that UBS Stock was an imprudent investment option for the Plan, they had an obligation to protect the Plan and its Participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in UBS Stock.

126.    Defendants had several options available to them for satisfying their duties: they could have made appropriate public disclosures; divested the Plan of UBS Stock; discontinued future UBS contributions or investments; and/or consulted an independent fiduciary regarding appropriate measures to take. On information and belief, Defendants failed to take any of these, or other actions, to protect Plan Participants. In fact, Defendants continued to allow heavy investment of the Plan's assets in UBS Stock even as UBS's problems came to light.

**C.    Defendants Failed to Provide Plan Participants with Complete and Accurate Information about the True Risks of Investment in UBS Stock in the Plan.**

127.    ERISA requires that plan fiduciaries fulfill a duty of loyalty to a plan and its participants, which includes the duty to speak truthfully when communicating with them. A fiduciary's duty of loyalty includes an obligation not to materially mislead, or knowingly allow others to mislead, plan participants.

128.    During the Class Period, Defendants communicated with Plan Participants concerning investments in UBS Stock. Upon information and belief, the communications included, but were

not limited to SEC filings, press releases, and Company financial information that was incorporated by reference into Plan Documents, and/or Plan related materials and communications. These communications were undertaken in a fiduciary capacity. Defendants failed to disclose that UBS Stock was not a prudent investment in any of these communications. Defendants also regularly communicated with employees, including Participants in the Plan, about the performance, future financial and business prospects of UBS, during the Class Period.

129.    During the Class Period, upon information and belief, Defendants fostered a positive attitude toward UBS Stock, and/or allowed Participants in the Plan to follow a natural bias toward investment in the equities of their employer, by not disclosing known negative material information concerning UBS Stock. As such, Participants in the Plan could not appreciate the true risks presented by investments in UBS Stock, and therefore could not make informed decisions regarding the Plan's UBS Stock investments.

130.    Defendants failed to provide Participants, and the market as a whole, with complete and accurate information regarding the true financial condition of UBS. Specifically, Defendants failed to provide the Plan and its Participants with complete and accurate information regarding UBS's serious mismanagement and improper business practices. UBS issued statements concerning the strength of its risk management controls, and the contribution of these controls to shareholder value. UBS also represented that, as part of its risk management strategy, the Company avoided concentrated risks. The Company also reported earnings, profits and other financial information that were materially false and misleading because they reflected an inflated value of UBS's subprime mortgage-backed assets.

131.    Just prior to the start of the Class Period, on February 13, 2007, UBS filed its

quarterly earnings report for the fourth quarter of 2006 on Form 6-K. Included in the 4Q 2006 Form

6-K was a Letter to Shareholders which stated:

> Our mortgage- and asset-backed securities business saw revenues grow handsomely as it benefitted from its strong presence outside the U.S., as the American housing market started to deteriorate in second half 2006. In structured credit we have also broadened the product range and our geographical reach. This was complemented by a new risk management and reporting platform. Even at this early stage, we recorded a substantial rise in 2006 revenues.

* * * * *

> The primary focus in our risk-taking activities is to ensure the adequate diversification of risk in order to avoid illiquid and concentrated positions, and to ensure that we are rewarded for the risks we take. We have transferred resources from businesses in illiquid markets into more liquid ones, and have actively pursued risk distribution strategies. Portfolios with poor returns on risk have been cut back and the quality of other portfolios has been enhanced.

132.    The 4Q 2006 Form 6-K also reported fourth quarter 2006 net profits of CHF 3.4

billion, basic EPS of CHF 1.73, diluted EPS of CHF 1.66 and operating income of CHF 12.542

billion. The 4Q 2006 Form 6-K also reported the following for the year end December 31, 2006:

net profits attributable to UBS shareholders of CHF 12.537 billion, basic EPS of CHF 6.20, diluted

EPS of CHF 5.95, and operating income of CHF 48.165 billion.

133.    Each of these statements in the February 2007 securities filings, as well as other

statements in the 4Q 2006 Form 6-K concerning the IB's profits and the Company's approach to

assessing and measuring market and portfolio risk, were materially false and misleading because

these statements reflected the artificially inflated value of UBS's subprime mortgage-backed assets

and other improper business practices.

134.    On March 21, 2007, the Company published its Annual Report for 2006. On the

same date, it filed its results for the year-ended December 31, 2006 with the SEC on Form 20-F.

37

A letter to shareholders accompanying the 2006 Annual Report and the 2006 Form 20-F discussed the importance of risk management in expanding UBS's business. The letter states:

> Our recent entry into new markets and the launch of new business ventures is, of course, associated with some risk. However, it is only as a result of our diligent effort to improve our risk portfolio over the last nine years that we have been able to assume them comfortably.

135.    The 2006 Annual Report also repeated the year-end profits attributable to UBS shareholders, net trading incomes, EPS, diluted EPS and operating income. It also reported the IB's operating income as CHF 21.787 billion, fixed income profits of CHF 2.945 billion, and trading portfolio assets of CHF 627.036 billion.

136.    The Annual Report further stated:

> All valuation models are validated before they are used as a basis for financial reporting, and periodically reviewed thereafter, by qualified personnel independent of the area that created the model. Wherever possible, we compare valuations derived from models with quoted prices of similar financial institutions, and with actual values when realized, in order to further validate and calibrate our models.

> Management therefore establishes valuation adjustments to cover the risks associated with the estimation of unobservable input parameters and the assumptions within the models themselves. . . [m]anagement believes that the fair values recorded in the income statement are prudent and reflective of the underlying economics, based on our established fair value and model governance policies and the related controls and procedural safeguards we employ.

137.    The Annual Report also boasted that "UBS management assessed the effectiveness of UBS's internal control over financial reporting as of December 31, 2006" and found that "UBS's internal control over financial reporting was effective." In addition to numerous other statements concerning the adequacy of UBS's risk policies, the 2006 Annual Report reported: "Controls and restrictions are placed on risk concentrations in trading books, taking into account variations in price volatility and market liquidity."

138.    Each of UBS's preceding statements as well as statements concerning UBS's approach to assessing and measuring market risk contained in the 2006 Annual Report were materially false and misleading because UBS failed to maintain adequate controls. The 2006 Annual Report also contained statements concerning UBS's market risk measurements that were materially false and misleading because UBS's market risk measurements failed to properly reflect the Company's exposure to maximum possible losses from risk. In fact, UBS intentionally manipulated UBS's systems to conceal the true market risk to which UBS was exposed.

139.    The 2006 Annual Report also represented that any "continuing involvement" in securitization transactions involving residential mortgage loans and securities by UBS "was primarily limited to the temporary retention of various security interests."

140.    In fact, these statements were materially false and misleading because, among other things, as UBS admitted in the Shareholder Report, beginning in February 2006, UBS employees retained "super senior" tranches of CDOs, illiquid positions that UBS held indefinitely, not temporarily.

141.    On May 3, 2007, UBS filed its quarterly earnings report with the SEC on Form 6-K for the first quarter of 2007. UBS reported net profits of CHF 3.275 billion, basic EPS of CHF 1.69, diluted EPS of CHF 1.62, and operating income of CHF 13.596 billion. The Form 6-K also reported total IB operating income of CHF 6.26 billion and pre-tax profit at an "all-time quarterly record of CHF 1,801 million, up 3% from the performance a year earlier."

142.    The reported net profits, basic EPS, diluted EPS, operating income and IB profits were all materially false and misleading because each of the financial figures included in the foregoing statements improperly valued UBS's subprime mortgage-backed assets. Moreover, by

May 3, 2007, Defendants knew that empirical tests of UBS's valuation assumptions demonstrated that UBS's valuation models for its subprime mortgage-backed assets were wholly unreliable and vastly overstated.

143.    On August 14, 2007, UBS filed its quarterly report with the SEC on Form 6-K for the second quarter of 2007.  UBS reported net profits of CHF 5.622 billion, basic EPS of CHF 2.90, diluted EPS of CHF 2.92, and operating income of CHF 16.12 billion.  The Form 6-K also reported that the "Investment Bank achieved another record pre-tax profit of CHF 1.185 billion up 3% from a year earlier."

144.    The reported net profits, basic EPS, diluted EPS, operating income and IB profits were all materially false and misleading because each of the financial figures included improperly valued UBS's subprime mortgage-backed assets.  Moreover, by May 3, 2007, Defendants knew that empirical tests of UBS's valuation assumptions demonstrated that UBS's valuation models for its subprime mortgage-backed assets were wholly unreliable and vastly overstated.

145.    The second quarter Form 6-K also contained false and misleading statements about the Company's market risk measurements which failed to properly reflect the UBS's exposure to subprime mortgage-backed securities, thereby understating the UBS's exposure to maximum possible losses from risk.  It also contained materially false and misleading statements concerning adherence to relevant accounting standards and losses in portfolios that were managed by Dillon Read.

146.    UBS filed its results for the first half of 2007 with the SEC on Form 6-K on October 1, 2007.  As before, the financial figures reported for trading portfolio assets pledged as collateral were materially false and misleading.

40

147.    On October 30, 2007, UBS filed its results for 3Q 2007.  On February 14, 2008, UBS's 4Q 2007 results were filed with the SEC.  Again, the reported net profits, basic EPS, diluted EPS, operating income, and trading portfolio assets were materially false and misleading because the financial figures reflected inflated valuations of UBS's subprime assets.

148.    On March 18, 2008, the Company published its Annual Report for 2007 and filed its year-end results with the SEC on Form 20-F.  The 2007 Annual Report reported year-end profits attributable to UBS shareholders of CHF 4.384 billion, basic EPS of CHF 2.28 billion, diluted EPS of CHF 2.28, and operating income of CHF 31.980 billion.  Again, this Annual Report contained materially false and misleading statements about the Company's market risk measurements which failed to properly reflect the Company's exposure to subprime mortgage-backed securities, thereby understating the Company's exposure to maximum possible losses from risk.  It also contained materially false and misleading statements concerning UBS's adherence to relevant risk matrixes and losses in portfolios that were managed by Dillon Read.

149.    At all relevant times, Defendants knew or should have known that the statements about UBS's financial performance were inaccurate due to the risks associated with UBS's massive subprime investments and lack of appropriate risk oversight.

150.    As a result of Defendants' knowledge of and, at times, role in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plan's Participants regarding the Plan's investment in UBS Stock did not effectively inform the Plan's Participants of the past, immediate, and future dangers of investing in UBS Stock.

151.    The SEC filings and related UBS statements and press releases issued during the

41

Class Period were inaccurate, incomplete and materially misleading, causing the Plan's Participants to hold and maintain Plan investments in UBS Stock. UBS's financial statements, its related press releases, and substantially similar SEC filings issued during the Class Period were inaccurate, incomplete and materially misleading in that they failed to properly inform the Plan's Participants of the Company's massive subprime related losses and other fraudulent business dealings. These statements were made with the implicit knowledge that the Plan's Participants would rely upon such information in determining whether to make and maintain Plan investments in UBS Stock.

**E.     Defendants Suffered from Conflicts of Interest**

152.    As ERISA fiduciaries, Defendants were required to manage the Plan's investments, including the investments in UBS Stock, solely in the interest of the Participants and beneficiaries, and for the exclusive purpose of providing benefits to Plan Participants and beneficiaries. This duty of loyalty requires fiduciaries to avoid conflicts of interest and to resolve them promptly whenever they may occur.

153.    When a company that invests its retirement plan assets in company stock founders, conflicts of interest are abundant. Plan fiduciaries are torn between their duties as officers and directors of the troubled company on one hand, and their obligations to the plan and its participants on the other.

154.    These types of conflicts of interest placed Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan Participants and beneficiaries, whose interests the Defendants were obligated to loyally serve with an "eye single."

155.    As a result of their divided loyalties, Defendants failed to investigate whether to take

action to protect the Plan, instead choosing the interests of the Company over those of the Plan by continuing to offer UBS Stock as a Plan investment option when Company insiders knew it was clearly imprudent to do so.

## CLAIMS FOR RELIEF UNDER ERISA

156. At all relevant times, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

157. ERISA § 502(a)(2), 29 U.S.C. §I 132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

158. ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

159. ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provide, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

160. These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the

duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." They entail, among other things:

a.    The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including in this instance the UBS Stock Fund, which invested in UBS Stock, to ensure that each investment is a suitable option for the plan;

b.    The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

c.    The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

161.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for Breach by Co-Fiduciary," provides, in pertinent part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(l), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes

44

reasonable efforts under the circumstances to remedy the breach.

162.    Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility.  Because ERISA permits the fractionalization of the fiduciary duty, there may be, as in this case, several ERISA fiduciaries involved in a given issue, such as the role of company stock in a plan.  In absence of co-fiduciary liability, fiduciaries would be incentivized to limit their responsibilities as much as possible and to ignore the conduct of other fiduciaries.  The result would be a setting in which a major fiduciary breach could occur, but the responsible party could not easily be identified.  Co-fiduciary liability obviates this.  Even if a fiduciary merely knows of a breach, a breach he had no connection with, he must take steps to remedy it:

> [I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . .[T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor.  The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

163.    Plaintiff therefore brings this action under the authority of ERISA §502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA §404(a)(l) and ERISA §405(a).

## ERISA § 404(c) DEFENSE IS INAPPLICABLE

164.    ERISA § 404(c) is an affirmative defense that provides a limited exception to

fiduciary liability for losses that result from participants' exercise of control over investment decisions. In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the numerous procedural promulgated under it.

165.    ERISA § 404(c) does not apply here for several reasons. First, the provision does not supply a defense to the fiduciaries' imprudent decision to select and continue offering UBS stock as an investment option in the Plan, as this is not a decision that was made or controlled by Participants.    Second, ERISA § 404(c) does not apply because Defendants failed to provide complete and accurate material information to Plan Participants regarding UBS Stock. Because ERISA § 404(c) does not apply here, Defendants are liable to the Plan for losses caused by the Plan's imprudent investment in UBS Stock during the Class Period.

## CAUSES OF ACTION

### COUNT I

#### Failure to Prudently and Loyally Manage
#### the Plan and its Assets

166.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

167.    At all relevant times, as alleged above, all Defendants were either named fiduciaries or *de facto* fiduciaries within the meaning of ERISA in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets. Thus, they were bound by the duties of loyalty, exclusive purpose and prudence.

168.    The scope of fiduciary duties and responsibilities of the Defendants included

46

managing the assets of the Plan for the sole and exclusive benefit of the Plan's Participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA. The Defendants were responsible for, among other things, reviewing and making policy recommendations with respect to the Plan, selecting prudent investment options, eliminating imprudent options, eliminating imprudent options, determining how to invest Company matching contributions to the Plan, evaluating the merits of the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

169.    Yet, contrary to their duties and obligations under ERISA, the Defendants failed to loyally and prudently manage the assets of the Plan. Specifically, during the Class Period, Defendants knew or should have known that UBS Stock was not a suitable and appropriate investment for the Plan, but was, instead, a highly speculative and risky investment in light of the Company's undisclosed improper business practices, serious mismanagement and misstatements and omissions that caused the price of UBS Stock to be artificially inflated. Nevertheless, during the Class Period, Defendants continued to offer UBS Stock as an investment option in the Plan, provided Company matching contributions in UBS Stock, and maintained and facilitated the Plan's enormous investment in UBS Stock.

170.    Defendants were obligated as Plan fiduciaries to prudently and loyally manage all of the Plan's assets. However, Defendants' duties of prudence and loyalty were especially significant with respect to UBS Stock because: (a) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and (b) participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock. In view of this, Defendants were obligated to have in place a regular, systematic procedure for evaluating the

prudence of investment in UBS Stock.

171.    Moreover, Defendants failed to conduct an appropriate investigation of the merits of continued investment in UBS Stock even in light of the Company's losses, its highly risky and inappropriate practices, and the particular danger that these practices posed to the Plan. Such an investigation would have revealed the imprudence of continuing to make and maintain investments in UBS Stock under these circumstances.

172.    Under the circumstance, Defendants' decisions concerning the Plan's investment in UBS Stock constituted an abuse of discretion. A prudent fiduciary could not have reasonably believed that further and continued investment of the Plan's assets in UBS Stock was appropriate during the Class Period.

173.    Defendants were obligated to discharge their duties with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 28 U.S.C. § 1104(a)(1)(B).

174.    Defendants did not act prudently when they continued to invest Plan assets in UBS Stock during the Class Period because they knew, or should have known, about the Company's failed risk controls which, coupled with its expansion into risky subprime asset acquisitions, made UBS Stock an extremely imprudent investment for the Plan. The risks associated with investment in UBS Stock during the Class Period far exceeded the normal, acceptable risk associated with Plan investment. The imprudence of the Plan's investments in UBS Stock was exacerbated by the fact that the risks were not disclosed to Plan Participants.

175.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or

48

directives that it knows, or reasonably should know, would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(I)(D), 29 U.S.C. §11 04(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries. Nor may a fiduciary allow others, including those whom they direct, or who are directed by the plan, to do so.

176.    Defendants breached their duty of prudence by continuing to offer UBS Stock as an investment option for the Plan when Defendants knew, or should have known, that UBS Stock was no longer a prudent retirement investment.

177.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and, indirectly, Plaintiff and the Plan's other Participants, lost many millions of dollars, a significant portion of their assets and retirement investments. If Defendants had discharged their duty to prudently invest the Plan's assets the losses suffered by the Plan's would have been minimized or avoided.

178.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 11 09(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### Failure to Provide Complete and Accurate
### Information to the Plan's Participants

179.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

180.    At all relevant times, as alleged above, Defendants were fiduciaries of the Plan within

the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

181.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need, in order to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide plan participants with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding a plan's investment options so that participants can make informed decisions with regard to the prudence of whether or not to keep or divest their plan investments. This duty applies to all of a plan's investment options, including investment in a sponsor's company stock.

182.    Defendants knew that investment in UBS Stock carried with it an undisclosed inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important.

183.    Defendants breached their duty to inform Participants by failing to provide complete and accurate information regarding UBS's mismanagement; its improper business practices, and its public misrepresentations, and the consequential artificial inflation of UBS Stock. In general, Defendants breached their duties by conveying incomplete information regarding the soundness of UBS Stock and the prudence of investing and holding retirement contributions in UBS Stock.

184.    Defendants' omissions clearly were material to Participants' ability to exercise informed control over their Plan accounts, as in the absence of the information, Participants did not know the true risks presented by the Plan's investment in UBS Stock.

185.    Defendants' omissions and incomplete statements were Plan-wide and uniform in that Defendants failed to provide complete and accurate information to any of the Plan's Participants. In addition, they caused the Plan and Participants, to continue to make and maintain substantial investments in UBS Stock at a time when the Defendants knew or should have known that Plan Participants did not have complete and accurate information concerning UBS Stock. Plan Participants relied to their detriment on Defendants' incomplete, inaccurate and materially misleading statements regarding the performance and future health of UBS Stock.

186.    Defendants are also liable as co-fiduciaries because (1) they knowingly participated in, and knowingly undertook, to conceal the failure of the other fiduciaries to provide complete and accurate information regarding the UBS Stock, despite knowing of their breaches; (2) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and (3) they had knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet did not make any effort to remedy the breaches.

187.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon the misrepresentations and omissions to his detriment. Here, the above-described statements, acts and omissions of the Defendants constitute misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in the UBS Stock and were material to any reasonable Participant's decision about whether or not to maintain any part of their assets in UBS Stock during the Class Period. Plaintiff and the other Participants are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

## COUNT III

### Breach of Duty to Avoid Conflicts of Interest

188.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

189.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

190.    ERISA § 404(a)(l)(A), 29 U.S.C. § 1104(a)(l)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

191.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities; and by otherwise placing their own and the Company's interests above the interests of the Plan and Plan Participants with respect to the Plan's investment in the UBS Stock.

192.    As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered tens of millions of dollars in losses. If Defendants had discharged their fiduciary duties to avoid conflicts of interest, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

193.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 11

09(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches

of fiduciary duties alleged in this Count.

## COUNT IV

### Failure to Adequately Monitor Other Fiduciaries
### (Against UBS & the Director Defendants)

194.    Plaintiff incorporates the allegations contained in the previous paragraphs of this

Complaint as if fully set forth herein.

195.    At all relevant times, as alleged above, UBS and the Director Defendants were

fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

196.    At all relevant times, as alleged above, upon information and belief, the scope of the

fiduciary responsibility of UBS and the Director Defendants included the responsibility to appoint,

evaluate, and monitor the performance of other fiduciaries, including the members of the Benefits

Committee and any other committees administrating the Plan and its investments.

197.    The duty to monitor entails both giving information to, and reviewing the actions of,

monitored fiduciaries. In this case, that means that the monitoring fiduciaries, UBS and the Director

Defendants, had the duty to ensure that the monitored fiduciaries:

      (1)    possessed the needed credentials and experience, or used qualified advisors

            and service providers to fulfill their duties; they were required to be

            knowledgeable about the operations of the Plan, the goals of the Plan, and the

            behavior of the Plan's Participants;

      (2)    were provided with adequate resources to do their job;

(3)    had adequate information to do their job of overseeing the Plan's investments;

(4)    had ready access to outside, impartial advisors when needed;

(5)    maintained adequate records of the information on which they were basing their decisions and analysis with respect to the Plan's investment options; and

(6)    reported regularly to UBS and/or the Director Defendants so that UBS and/or Director Defendants could then review, understand, and approve the conduct of the monitored fiduciaries.

198.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries perform their fiduciary obligations, including those with respect to the investment of a plan's assets. They must also take prompt and effective action to protect a plan and its participants when the fiduciaries they are monitoring are not performing appropriately. In addition, a monitoring fiduciary must provide the monitored fiduciaries with all the information they possess, that they know or reasonably should know, that the monitored fiduciaries must have in order to prudently manage a plan and its assets.

199.    UBS and the Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems (alleged above), which made UBS Stock an imprudent Plan investment; and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in UBS Stock, an investment that was imprudent and subject to inevitable and significant depreciation.

200.    UBS and the Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were continuing to invest the assets of the Plan in UBS Stock

when it no longer was prudent to do so. Despite this knowledge, UBS and the Director Defendants failed to take action to protect the Plan, and concomitantly the Plan's Participants, from the consequences of the monitored fiduciaries' failures.

201.    In addition, UBS and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of UBS that they knew or should have known that the monitored fiduciaries needed to make sufficiently informed decisions. By remaining silent and continuing to conceal material information from subordinate fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

202.    UBS and the Director Defendants are also liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries. UBS and the Director Defendants enabled breaches by the other Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

203.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other Participants and beneficiaries, lost tens of millions of dollars, a significant portion of their retirement investments.

204.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## CAUSATION

205.    The Plan suffered many millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in UBS Stock during the

Class Period, in breach of Defendants' fiduciary duties. These losses were reflected in the diminished account balances of the Plan's Participants.

206.    Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and its Participants would have avoided a substantial portion of the losses that they suffered as a result of their continued investment in the UBS Stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

207.    Defendants breached their fiduciary duties in that they knew or should have known the facts above and thus should have known that the Plan's assets should not have been invested in UBS Stock during the Class Period.

208.    As a consequence of the Defendants' breaches, the Plan suffered significant losses.

209.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary ... who breaches any of the ... duties imposed upon fiduciaries ... to make good to such plan any losses to the plan ..." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate...."

210.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment. Where alternative investments were available, investments made or maintained in the challenged investment are assumed to have been invested instead in the most profitable alternative investment available. In this way, the remedy restores the value of the Plan's assets to what they would have been if the Plan had been properly administered.

211.    Plaintiff, the Plan, and the Class are therefore entitled to relief from the Defendants in the form of:

      (1)     a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a);

      (2)     injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a);

      (3)     reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law;

      (4)     taxable costs;

      (5) interests on these amounts, as provided by law; and

      (6) such other legal or equitable relief as may be just and proper.

212.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary for losses suffered by the Plan in this case.

## CLASS ACTION ALLEGATIONS

213.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

All persons who were Participants in or beneficiaries of the Plan, at any time between April 1, 2007 and the present (the "Class Period") and whose Plan accounts included investments in UBS Stock.

57

214.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are several thousand members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period and whose Plan accounts included investment in UBS Stock. According to the most recent Annual Report of the Plan on Form 11-K available, there were 21,932 Plan Participants at the end of 2006.

215.    Common questions of law and fact exist as to all members of the proposed Class and predominate over any questions affecting solely individual members of the proposed Class. Among the common questions of law and fact are:

a.    whether Defendants each owed a fiduciary duty to the Plan, Plaintiff and members of the proposed Class;

b.    whether Defendants breached their fiduciary duties to the Plan, Plaintiff and members of the proposed Class by failing to act prudently and solely in the interests of the Plan and the Plan's Participants and beneficiaries;

c.    whether Defendants violated ERISA; and

d.    whether the Plan and members of the proposed Class have sustained damages and, if so, what is the proper measure of damages.

216.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, the Plan, and the other members of the proposed Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

217.    Plaintiff will fairly and adequately protect the interests of the members of the proposed Class and has retained counsel competent and experienced in class action, complex, and

58

ERISA litigation. Plaintiff has no interests antagonistic to, or in conflict with, those of the Plan or the Class.

218.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

219.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

220.    During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.     A Declaration that the Defendants, and each of them, have breached their ERISA
       fiduciary duties to the Participants;

B.     A Declaration that the Defendants, collectively and separately, are not entitled to the
       protection of ERISA § 404(c)(l)(B), 29 U.S.C. § 1104(c)(I)(B);

C.     An Order compelling the Defendants to make good to the Plan all losses to the Plan
       resulting from Defendants' breaches of their fiduciary duties, including losses to the
       Plan resulting from imprudent investment of the Plan's assets, and to restore to the
       Plan all profits the Defendants made through use of the Plan's assets, and all profits
       which the participants would have made if the Defendants had fulfilled their
       fiduciary obligations;

D.     Imposition of a Constructive Trust on any amounts by which any Defendant was
       unjustly enriched at the expense of the Plan as the result of breaches of fiduciary
       duty;

E.     An Order requiring Defendants to appoint one or more independent fiduciaries to
       participate in the management of the Plan's investment in UBS Stock;

E.     Actual damages in the amount of any losses the Plan suffered, to be allocated
       among the participants' individual accounts in proportion to the accounts' losses;

F.     An Order that Defendants allocate the Plan's recoveries to the accounts of all
       Participants who had any portion of their account balances invested in the
       common stock of UBS maintained by the Plan in proportion to the accounts'

losses attributable to the decline in the stock price of UBS;

G.  An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H   An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the

common fund doctrine; and

I.  An Order for equitable restitution and other appropriate equitable monetary relief

against the Defendants.

Dated: August 28, 2008          KLAFTER OLSEN & LESSER LLP


_____
Jeffrey A. Klafter (JK-0953)
1311 Mamaroneck Avenue, Suite 220
White Plains, NY 10605
Tel.: (914) 997-5656
Fax: (914) 997-2444


KLAFTER OLSEN & LESSER LLP
KURT B. OLSEN
1250 Connecticut Ave., N.W., Suite 200
Washington, DC 20036
Tel.: (202) 261-3553
Fax: (202) 261-3533

BERGER & MONTAGUE, P.C.
TODD S. COLLINS
SHANON J. CARSON
ELLEN T. NOTEWARE
1622 Locust Street
Philadelphia, PA 19103
Tel.: (215) 875-3000
Fax: (215) 875-4604

*Attorneys for Plaintiff*